LAW OFFICE OF ANTHONY CECUTTI
217 Broadway, Suite 707
New York, New York 10007
Phone: (212) 619-3730
Cell: (917) 741-1837
anthonycecutti@gmail.com

February 14, 2022

**BY ECF**
The Honorable Margo K. Brodie
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

### RENEWED MOTION FOR "COMPASSIONATE RELEASE" *OR* REDUCTION OF SENTENCE

**Re: United States v. Vincent Giattino; 90 Cr. 424 (MKB)**

Dear Judge Brodie:

We write to again ask Your Honor to release Vincent Giattino *or* reduce his sentence so that he may have the chance to live out the remainder of his life with his family and not die in prison.

As we described in our reply,[1] which was submitted as part of Mr. Giattino's initial *pro se* motion[2] for "compassionate release," Mr. Giattino has been incarcerated for approximately 30 years following his convictions at trial and sentence of life imprisonment. At the time of his arrest in 1991, Mr. Giattino had been married for a few years to Shirley and was raising their daughter, Brigitte, who had just started walking. Now, approaching 70 years of age, and experiencing declining health, he is in the final years of his life. He is remorseful for his past actions and who he was. Mr. Giattino lives with deep regret and guilt. Yet, throughout his life sentence, he has stayed connected with his supportive family, engaged in programming within prisons, encouraged and helped other inmates, helped raise Brigitte through daily calls and regular visits, and experienced her birthdays, and all her milestones and accolades with her over the phone, and fought to keep hope; hope that one day he could be released. Presently, Mr. Giattino is fighting to keep his hope alive. He has an ever-growing fear that he may die in prison

---

[1] *See* Dkt. No. 721, dated November 9, 2020.

[2] *See* Dkt. No. 711, dated September 2, 2020.

1

if he becomes infected with COVID-19, or, suffer serious health complications.  Or, that he may simply succumb to "death by incarceration," and never again be a father to Brigitte outside of prison.

Mr. Giattino is a changed man.  Over the last 30 years, he has been rehabilitated.  He "has repeatedly shown remorse for the misguided decisions he made as a younger man" and "learned from the mistakes of his past."[3]  Further, Mr. Giattino, despite a life sentence, has sought to improve the lives of his fellow inmates, becoming a "father to many."[4]  Not the same man that was sentenced nearly 30 years ago, his longtime prison Counselor, Joshua Newcomer, and other staff, recommend that Mr. Giattino be released.[5]  Fortunate to have a close and supportive family, a release plan is in place whereby he can live safely and work and earn a modest living.[6]  The attached letters[7] further make clear that continued incarceration serves no further purpose.

Yet, and as we implored the Court to previously consider, there is another critical reason to release Mr. Giattino: to restore his relationship with his daughter, Brigitte Giattino.  Despite her personal hardships related to her father's incarceration, Brigitte overcame serious setbacks and challenges.  Now a school psychologist, she seeks to help children who are struggling.  Describing her father in her heartfelt letter to Your Honor as her "biggest supporter and champion," she fears his death and deeply desires to have "time with him in real life."[8]

Outside of his significant rehabilitation efforts and transformation, additional "extraordinary and compelling" reasons warrant his release *or* reduction in his sentence.  Vast disparities now exist between his pre-Guidelines plea offer of 10 years and post-trial sentence of life imprisonment, and between his life sentence and sentences of similarly-situated co-defendants, who were convicted by plea of murders and other offenses.  This is based on the "trial penalty;" a crushing penalty that Mr. Giattino paid by exercising his constitutional right to proceed to trial.  Further, while his offenses of conviction are undeniably serious, defendants who had received sentences of life imprisonment after trial for murders, and murders and other related offenses committed as part of their leadership and or participation in "organized crime" have been granted "compassionate release" *or* reductions in their sentence.  Such reflects a shift by federal courts to engage in a "second look" of life sentences, where elderly defendants have been incarcerated for decades, suffered from serious medical conditions and engaged in significant rehabilitation efforts.  Finally, Mr. Giattino remains at risk of serious illness or death

---

[3] *See* Exhibit "A" (Letters from Family: Marie Scheuerman (sister of Vincent Giattino) dated August 2, 2020, Dkt. No. 711, p. 52-53).

[4] *See* Exhibit "B" (FCI Allenwood Inmate Letters: Letter from Donnie Stuckey, October, 2020, Dkt. No. 721-1).

[5] *See* Exhibit "C" (FCI Allenwood Staff Letters: Letter from J. Newcomer, Counselor FCI Allenwood, dated August 19, 2020, Dkt. No. 711, p. 51).

[6] *See* Exhibit "D" (Release Plan: Letter from John Raucci).

[7] The letters attached to this renewed motion were submitted as part of Mr. Giattino's initial motion for "compassionate release."  *See* Dkt. Nos. 721 and 711.

[8] *See* Exhibit "E" (Letter from Brigitte Giattino, dated October 28, 2020, Dkt. No. 721-3).

should he be infected with COVID-19 and he has been incarcerated under brutal and harsh conditions for approximately the last 2 years, which has greatly impacted his emotional and physical well-being.

For all the above reasons, I implore this Court to extend mercy to a changed man seeking to live his final years in peace with himself and his family, particularly, Brigitte. Simply put, Mr. Giattino has suffered and paid a great price and been sufficiently punished. He should be released.

1. **Pursuant to 18 U.S.C. § 3582(c)(1)(A), and Based on the "Totality of Circumstances," "Extraordinary and Compelling Reasons" are Present Justifying the Reduction of Mr. Giattino's Sentence**

Under 18 U.S.C. § 3582(c)(1)(A), a court:

> upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf . . . may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that— (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

With the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, Congress amended 18 U.S.C. § 3582(c)(1)(A) to allow defendants to seek "compassionate release" directly from federal courts rather than exclusively from the Bureau of Prisons ("BOP"). *United States v. Ebbers*, 432 F. Supp. 3d 421, 422-23 (S.D.N.Y. 2020). Before the First Step Act, Congress had tasked the Sentencing Commission with identifying circumstances that are sufficiently "extraordinary and compelling" to justify a reduction in sentence. *Id.* at 427 (citing 28 U.S.C. § 994(t)). The Commission did so in U.S.S.G. § 1B1.13 and its corresponding commentary. That guidance, *inter alia*, (1) sets out various circumstances that present extraordinary and compelling reasons justifying release; and (2) requires that a defendant not be a danger to the community. *Id.* § 1B1.13(1)–(3) & cmt. n.1(A)–(D). The Second Circuit clarified that § 1B1.13 "is not 'applicable' to compassionate release motions brought by defendants," rather than by the BOP, and "cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling" in such cases. *United States v. Brooker*, No. 19-3218, 2020 WL 5739712, at *6 (2d Cir. Sept. 25, 2020); *see also id.* at *7 ("Neither Application Note 1(D), *nor anything else in the now-outdated version of Guideline § 1B1.13*, limits the district court's discretion." (emphasis added)).

Consistent with *Brooker*, "in assessing a § 3582(c) motion brought directly by a defendant, [this] Court is not constrained by either § 1B1.13's enumeration of extraordinary and compelling reasons, or its separate requirement that the defendant seeking release not pose any danger to the community." *United States v. Lizardi*, 11 Cr. 1032 (PAE) (S.D.N.Y. October 9, 2020). Rather, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," 18 U.S.C. § 3582(c)(1)(A)(i), [this] Court may "consider the full slate of

3

extraordinary and compelling reasons that an imprisoned person might bring before [it] in motions for compassionate release." *Brooker*, 2020 WL 5739712, at *7. A court need not find a single dispositive circumstance to determine that "extraordinary and compelling reasons" exist. Rather, it may consider whether "the totality of the circumstances" justify such a finding. *United States v. Phillips*, 469 F. Supp. 3d 180, 184 (S.D.N.Y. 2020); *see also United States v. Cantu-Rivera*, No. H-89-204, 2019 WL 2578272, at *2 (S.D. Tex. June 24, 2019) (finding that "[t]he combination of all … factors establishes the extraordinary and compelling reasons justifying the reduction in sentence in this case"). Here, the "totality of circumstances" point to the existence of "extraordinary and compelling reasons" for "compassionate release" *or* a reduction in Mr. Giattino's sentence.

2. **Based on the "Totality of Circumstances," "Extraordinary and Compelling Reasons" Exist in Support of "Compassionate Release" *or* a Reduction in Mr. Giattino's Life Sentence**

Vincent Giattino is now in his 4th decade of incarceration. Based on the "totality of circumstances," "extraordinary and compelling reasons" exist for a reduction in Mr. Giattino's sentence and release:

As outlined below, Mr. Giattino was arrested in 1991. Following his arrest, he was released on bail. The Government offered him a pre-Guidelines plea offer of 10 years' incarceration.[9] He rejected the offer and exercised his constitutional right to proceed to trial. Following his convictions after trial, he was subject to mandatory life imprisonment. Such punishment was drastically different from what the Government offered Mr. Giattino, and what the Government offered his co-defendants charged with murders. Additionally, it was grossly higher than the sentences imposed on his co-defendants who elected to resolve their cases, and corresponding murder charges, by way of plea agreements with the Government. Aside from the lead and capital defendant Thomas Pitera, no defendant received a sentence of more than 20 years, including those convicted of murders. Accordingly, due to the "trial penalty," enormous disparities exist between his plea offer and post-trial sentence, and sentences of similarly-situated co-defendants. Such constitutes "extraordinary and compelling reasons" warranting "compassionate release" *or* a reduction in his sentence.

In addition, federal courts have increasingly engaged in "second look" analysis of life sentences involving elderly defendants convicted of violent offenses, including murders, and who suffer from serious medical conditions and have engaged in significant rehabilitation efforts. Such defendants have received "compassionate release" *or* had their sentences reduced, despite convictions following trial of murder and other related offenses committed as part of their leadership and or participation in "organized crime." *See infra*, Section 4, p. 15-19. This trend cannot be overlooked and compels reconsideration of Mr. Giattino's sentence of life imprisonment.

---

[9] *See* Exhibit "F" (James R. Froccaro, Jr. Affirmation).

Moreover, Mr. Giattino is a Care Level II inmate who requires chronic care. He is also on a "High Risk Health List" at FCI Allenwood.[10] Suffering from obesity, hypertension, asthma and diabetes, and utilizing a CPAP machine, Mr. Giattino is, pursuant to the CDC guidelines, at heightened risk of severe illness or death from COVID-19. While Mr. Giattino has been vaccinated, he is still vulnerable to infection. Should he be infected, he may die. Or, he could suffer from serious illness and or suffer significant long-term consequences and not fully recover.

Lastly, continued incarceration will likely result in a debilitating and unnecessarily cruel decline in his physical and emotional health. Under the present significant restrictions, which include severe lockdowns, no programming, no work and minimal contact with family, Mr. Giattino's mental and emotional health has been crushed. Simply put, the conditions that he has experienced over almost *2 years* and will continue to experience for an indefinite amount of time, are inhumane, and are also "extraordinary and compelling reasons" which call for the end of nearly 30 years of incarceration.

**3. Vincent Giattino's "Compassionate Release" and Placement on Home Confinement *or* Reduction in His Sentence is Consistent with the Purposes and Objectives of § 3553(a)[11]**

Consideration of the §3553(a) factors further supports Mr. Giattino's release *or* a reduction in his sentence. Nearing 70 years of age, and through significant rehabilitation efforts, he has grown, changed and transformed. Additionally, he suffers from poor health. Further, "compassionate release" or a reduction in his sentence will not create any sentencing disparities. Rather, "compassionate release" or a sentencing reduction will offset the significant penalty he paid by exercising his constitutional right to proceed to trial and eliminate sentencing disparities that exist in his case.

*i.     The Offenses of Conviction and Sentence of Life Imprisonment*

Mr. Giattino along with 15 others were charged on June 1, 1990 with participating in racketeering conspiracy, which included multiple homicides, in *United States v. Thomas Pitera et al.,* 90 Cr. 424.[12] Mr. Giattino was arrested on July 29, 1991 in Florida. He was ordered removed to Brooklyn. Despite the seriousness of the charges he faced, he later was released on bail pending trial.[13] Prior to trial, discussions between the Government and Mr. Giattino's

---

[10] *See* Exhibit "C" (FCI Allenwood Medium Staff Letters - B. Oberdorf Letter, dated October 25, 2020, Dkt. No. 721-2).

[11] In this section, we rely on much of the "life history and characteristics" and rehabilitation information we provided in our reply, *see* Dkt. No. 721, that we submitted as part of Mr. Giattino's initial *pro se* motion for "compassionate release," *see* Dkt. No. 711.

[12] A related case, *United States v. Martini et al*, 90 Cr. 494 (AMD) was also charged the same year and included 16 defendants accused of participating in organized crime.

[13] *See* Exhibit "F" (James R. Froccaro, Jr. Affirmation).

counsel occurred regarding a resolution.[14] The Government made an oral plea offer which included a ten-year sentence of incarceration.[15] Mr. Giattino rejected the offer and proceeded to trial.[16]

Following trial, on November 5, 1992, Mr. Giattino was convicted of participating in a racketeering conspiracy, which included two homicides, and other related offenses. He was sentenced on February 26, 1993 to multiple concurrent life sentences and a thirty-year consecutive sentence.

Mr. Giattino was an associate of the Bonnano family. He was primarily involved in the distribution of cocaine and marijuana. He has not, and never became, a "made man" – someone initiated into a crime family through the sponsorship of another "made man" and murdering someone. He also had a limited criminal history. According to the Government, he "took part" in the murders of Phyllis Burdi and Wilfred "Willie Boy" Johnson under the direction of "captain" Thomas Pitera.[17] PSR ¶ 18. Mr. Giattino never planned or actually committed either murder. The Burdi and Johnson murders were both planned and actually committed by Pitera. Had Mr. Giattino actually killed Burdi and or Johnson, he would likely have become a "made man." However, that never happened.

    *ii.    Sentences of Mr. Giattino's Co-Defendants*

No defendant, aside from Pitera, including those convicted of homicides and those charged in the related *Martini* case received a sentence greater than 20 years. For instance, co-defendant Richard David, a former New York court officer, pleaded guilty in 1991 to racketeering, admitting to his participation in the murder and dismemberment of a police informant, Talal Siksik, among the predicate acts. In 1993, he was sentenced to 20 years' incarceration. Sentenced on January 7, 2002 when parole still existed in the federal system, David was released early and placed on parole supervision. Likewise, William "Billy" Bright received a sentence of 204 months' incarceration following his conviction by plea involving a homicide.

---

[14] *See Id.*

[15] *See Id.*

[16] *See Id.*

[17] As argued by the Government at his trial, "[Pitera] murdered almost everyone himself, taking delight in being the executioner and then the butcher of the victims' bodies." *See "Specter of Execution Hangs Over Murder Trial,"* N.Y. Times (May 6, 1992)). On June 25, 1992, Pitera was convicted, following a two-month capital trial, of multiple acts of murder, narcotics trafficking, and various firearms offenses related to his leadership of a racketeering enterprise, the Pitera crew of the Bonanno family. *See Id.,* and *"Reputed Mobster Guilty In Six Narcotics Murders,"* N.Y. Times (June 26, 1992)). On October 23, 1992, he was sentenced to seven concurrent life sentences on the racketeering and murder charges, and several statutory maximum terms of imprisonment on the narcotics and weapons charges.

6

At present, only Pitera remains incarcerated from the *Pitera* and *Martini* cases. All defendants have either been released or have passed away.

Had Mr. Giattino accepted the Government's 10-year plea offer, he would never have been in the position he is today – at significant risk of dying in prison.

> a. The "Trial Penalty" of Life Imprisonment and Sentencing Disparities with his Co-Defendants Convicted of Murders

Judges regularly impose longer sentences on those defendants who proceed to trial than on those defendants who plead guilty. A 2018 report, *The Trial Penalty: The Sixth Amendment Right To Trial On The Verge Of Extinction And How To Save It*,[18] shows that, on average, trial defendants receive sentences three times longer than those defendants who plea guilty. In essence, they are penalized for going to trial by way of the "trial penalty."

Mr. Giattino exercised his fundamental constitutional right to a jury trial to resolve the charges against him, rather than pleading guilty and receiving a 10-year sentence. The sentencing disparity between a 10-year plea offer and a post-trial sentence of life imprisonment directly contravenes a core value at the heart of our democracy. As an accused person, he should not have had to gamble with years of his life, and risk life imprisonment, to exercise his constitutional right. And yet, he did gamble and lost big; so big that he may die in prison.

Consistent with the policy goals of 18 U.S.C. § 3553(a)(6), in assessing whether a post-trial sentencing disparity is unwarranted, a court should consider the sentences imposed on similarly situated defendants, including a defendant who pleaded guilty in the same matter, and the defendant who was convicted after trial. A leader who directly killed several people, and committed other acts of violence, Pitera is in a category unto his own. Mr. Giattino is similarly situated to several of his co-defendants, in particular, those who were convicted of murders and other offenses by plea. They received no more than 20 years' imprisonment. Such co-defendants include Richard David and William "Billy" Bright, who received sentences of 240 months and 204 months, respectively. Mr. Giattino should not be sentenced so significantly different and so much more harshly simply because he rejected a 10-year plea offer and proceeded to trial.

The "trial penalty" received by Mr. Giattino thereby created two massive disparities: a disparity in his plea offer and sentence after trial, and disparities with similarly-situated co-defendants. As such, pursuant to 18 U.S.C. § 3553(a)(6), Mr. Giattino's sentence should be reduced.

---

[18] *See* at https://www.nacdl.org/getattachment/95b7f0f5-90df-4f9f-9115-520b3f58036a/the-trial-penalty-the-sixth-amendment-right-to-trial-on-the-verge-of-extinction-and-how-to-save-it.pdf

    *iii.*  Vincent Giattino's Good Character, Remorse and Constant and Unwavering Support from his Family

 Several family members and a mother of an inmate submitted letters in support of Mr. Giattino's release, which were attached to his previously filed *pro se* motion. *See* Exhibit "A," Dkt. No. 711, pp. 50-57; Dkt. No. 714, pp. 4-6. Such letters reflect that even after nearly 30 years, Mr. Giattino has maintained the support from his family. This speaks to his good character. While sharing their real concerns related to his health, they also expressed Mr. Giattino's good character and his remorse for his past choices. Marie Scheuerman, who has faithfully visited her brother over the years, writes,

> … Over the many years we have kept in touch, he has repeatedly shown remorse for the misguided decisions he made as a younger man.
>
> Vincent has been in prison for a very long time and has most certainly learned from the mistakes of his past. He is now a mature, older man in poor health who wants to go home, be with his family and leave this prison existence behind him.

*See* Exhibit "A" (Letters from Family: Marie Scheuerman Letter, dated August 2, 2020, Dkt. No. 711, pp. 52-53).

 Likewise, Christopher Scheuerman, who has also regularly visited his uncle while he has been incarcerated, writes,

> [Vincent Giattino] has served nearly 30 years and is remorseful for the impact his choices have had on his family and others. He acknowledges that his poor decisions have placed him in this current position.

*See* Exhibit "A" (Letters from Family: Christopher Scheuerman Letter, dated August 2, 2020, Dkt. No. 711, p. 54).

 Shirley Giattino, Brigette's mother and Mr. Giattino's ex-wife, has known Mr. Giattino for over 40 years and has visited him throughout his incarceration. She describes him in her letter as an "exceptional man"; "caring," "trustworthy," "respectful," and "loving," who goes out of his way to help others.[19]

 Each of Mr. Giattino's family members are willing and able to support him. Should he be released, he will be able to live safely with his cousin, John Raucci and his family. Mr. Raucci also can provide Mr. Giattino with employment at his company.[20] Mr. Giattino also has significant family support. The extent of family support is described by his cousin, Frances Giattino, "[w]e can financially support him, teach him, and get him back on his feet upon his

---

[19] *See* Exhibit "A" (Letters from Family: Shirley Giattino Letter, dated August 13, 2020, Dkt. No. 714, p. 4).

[20] *See* Exhibit "D" (Release Plan: John Raucci Letter).

8

release … our family is very large. Each and every person in it is another branch of support for him, we are all very close and all on the same boat when it comes to Vincent. We miss him, and want to see him again. So does his daughter, who he has never really met outside of visits and phone calls."[21]

       iv.    *Vincent Giattino's Rehabilitation While Incarcerated Over the Last 30 Years*

As the Supreme Court has recognized, "evidence of postsentencing rehabilitation may be highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing." *Pepper v. United States*, 562 U.S. 476, 491 (2011); *see also United States v. Austin*, 06 Cr. 991 (JSR), 2020 WL 3447521, at *3 (S.D.N.Y. June 22, 2020) (recognizing that rehabilitation is "an important factor" in compassionate release); *United States v. Torres*, 87 Cr. 593 (SHS), 2020 WL 2815003, at *7 (S.D.N.Y. June 1, 2020).[22]

Mr. Giattino has been rehabilitated and is a changed man. Despite serving a life sentence, he has used his time in prison to try and better himself, and also his prison community. He has participated in programs and classes. Further, letters from prison staff and inmates, who have spent considerable time with Mr. Giattino, reveal a man who has transformed. Letters from prison staff describe him as "respectful" and a "gentleman," someone with "the ability to become a productive member of society."[23] Counselor Joshua Newcomer, in his letter, recommends that Mr. Giattino be released. Counselor Newcomer is the closest staff member to Mr. Giattino and has had regular contact with him over the last 7 years. He writes,

> Inmate GIATTINO, VINCENT has been incarcerated at FCI Allenwood since July, 2013. I have known inmate GIATTINO, VINCENT since he arrived here. I have known GIATTINO, VINCENT to be consistent in his behavior and has maintained a good standing with staff and inmates. I have known inmates to approach GIATTINO, VINCENT for positive guidance and advice. To add, I know GIATTINO, VINCENT has been battling some health issues and I have discussed this with GIATTINO, VINCENT; therefore, it would be beneficial for GIATTINO, VINCENT to have the chance to be released to better battle his health issues with the support of his family.

*See* Exhibit "C" (Letter from J. Newcomer, Counselor FCI Allenwood, dated August 19, 2020, Dkt. No. 711, p. 51).

Recreation Specialist, B. Oberdorf, who has known Mr. Giattino for the last 10 years, recommends that Mr. Giattino also be released. He writes,

---

[21] *See* Exhibit "A" (Letters from Family: Frances Giattino Letter, dated August 4, 2020, Dkt. No. 711, p. 57).

[22] As the Second Circuit has observed, in slightly different circumstances, the federal criminal justice system is premised "on the belief that, at least to some extent, all criminal acts are aberrant" and on "the recognition that an individual is more than the crime of which that individual has been accused." *United States v. Mattis*, 963 F.3d 285, 293, 294 (2d Cir. 2020) (affirming order setting bail for defendants accused of violent and dangerous crime).

[23] *See* Exhibit "C" (FCI Allenwood Medium Staff Letters).

> I have known inmate Giattino since 2010 when I worked at USP Allenwood as a correctional officer. Inmate Giattino has since worked his way to the FCI Allenwood. Inmate Giattino has always been a character but has changed [h]is attitude and outlook a complete one hundred and eighty degrees while at the FCI … Given the Covid-19 outbreak and his "High Risk" health I personally feel that he would benefit more being released [where] he can continue to work on his health instead of being quarantined. Inmate Giattino has always been respectful to both staff and inmates and communicates exceptionally well with both. I think given his age and "High Risk" health he should be highly considered for a release due to Covid-19.

*See* Exhibit "C" (FCI Allenwood Medium Staff Letters - B. Oberdorf Letter, dated October 25, 2020, Dkt. No. 721-2).

Mr. Giattino's fellow inmates have also written in support of his release.[24] These inmates describe him as someone who is trusted and relied upon for advice and guidance. While serving a life sentence, he has sought to improve the lives of those who are incarcerated and who will be released. He is also a man with a "heart of gold," a "true friend," a better man because of his mistakes, remorseful and a "father to many." They write:

- "[Vincent Giattino] was one of the first guys to introduce himself, as well as extend his hand, when I came to FCI Allenwood. From that day forth Mr. Giattino has been someone that I felt comfortable enough to go to for advice about issues in the institution, as well as personal issues. And he's always given me sound and mature advice, felled with wisdom. Mr. Giattino is a humble man, with a heart of gold, that is like a father to many" - Letter from Donnie Stuckey, October, 2020.

- "Vincent is more than just my cell-mate, he is my best friend. I have lived in close quarters with him for the better of 6 years, and in that time he has shown nothing but honest and caring tendencies … He is constantly telling individuals that are just coming into the system as well as about to be released to stay off drugs and stay out of trouble, because the end result is always prison or death and pain and grief for ones family. Vincent is not the same person that was sentenced 30 years ago. When the cell doors lock at night and we talk, I know he is a changed person" - Letter from Mark Basnight, dated October 19, 2020.

- "I have personally been able to benefit from Vincent's willingness to help those around him. He has helped me set my sights on doing something constructive and good with my time" - Letter from Shawn Maciel, dated October 20, 2020.

---

[24] *See* Exhibit "B" (FCI Allenwood Inmate Letters).

- "To say that [Vincent] is a good guy is an understatement. He is always giving advice to the younger guys and helping them to avoid some of the same mistakes he has made. He is always telling them guys how important it is to change their mentality so they can stay out of prison" - Letter from Alphonso Drapeau, dated October 20, 2020.

- "[Vincent] goes out of his way to try and help out some of the younger guys from making mistakes here in the prison with his experience and advice" - Letter from Harry Schiech, dated October 20, 2020.

- "After serving multiple decades of critical disfavor in a regressive prison system, he has more than earned the chance to show civilization his rehabilitative state. He has earned multiple certificates and scholar credits. He has helped many inmates including myself do the same in preparation for society. He has also been a companion for inmates who's considered suicide. He helped them to see the positivity in life … He will be a great mentor to the younger generation of former dissidents who have herd his story and see the living example of change and outstanding citizen he has become … It is my greatest concern, he won't get the chance to teach his grandkids not to make the mistakes he has also, how he's a better man because of his mistakes" - Letter from Marquis Riley, October, 2020.

- "Since I got into this institution [Vincent] has been like a mentor to me. He has helped me with understanding how things work around here and has looked out for me since I arrived … when I needed a cell to movie into he moved me in with him. [It] helped me with looking into taking college classes and earning credit while doing my time here … I believe he is remorseful of his past and he would be very grateful of the opportunity to be with his family during these times of disease and with his ailing health putting him at high risk" - Letter from Colin Harle, October, 2020.

- "Always there to give productive word of encouragement to people he see going astray, so I know that he will be an asset to the world should he be released" - Letter from Derrick Grant, October 21, 2020.

- "I have learned [from Vinny] that being positive through a horrible situation is truly a state of mind and if Vinny didn't tell you, you would never guess he has been going through this for 30 years. Even after all that time, Vinny has an infectious personality and loves to laugh. Loves it …he never focuses on what is going wrong. He focuses on trying to enjoy his life the best way he can … while talking with him he has opened up a bit about his personal life … while talking about his daughter I see a man who is deeply sorry for lost time and opportunity … anyone who has made mistakes understands the loss of sleep and unrest. The nights imagining different scenarios of how, if given a chance, they would live their life in a completely different way … I know that people change … there is a difference between bad people and

11

good people who have done bad things. In my eyes he is the latter" - Letter from Timothy Gravl, October, 2020.

      v.      *Vincent Giattino's Loving and Close Relationship with his Daughter, Brigette Giattino*

Brigitte was barely walking when her father became incarcerated. Yet, they share a close and loving bond. While she has never had a relationship with him outside of regular and continuous prison visits and phone calls, she states in her heartfelt letter, *see* Exhibit "E" (Brigitte Giattino Letter, dated October 28, 2020, Dkt. No. 721-3), to Your Honor that he did a "phenomenal job" in raising her from behind prison walls. Whether in good, ordinary or tough times, Mr. Giattino has "been there" for Brigitte. He never "gave up" on her, even when she "pushed him away." "He continued to call when [she] refused to answer. He wrote to [her] letters and cards. He contacted other family members so that they could [her] messages of love and support." In describing her father's steadfast love and commitment to her, Brigitte further writes,

> Although my dad has been incarcerated for my entire life, he has also been there for me (on the phone) for every birthday, holiday, and major milestone thus far. Before the COVID restrictions, my dad has called me almost every single day for as long as I can remember. Every memory I have of major events in my life, I also have a memory of my Dad being there, on the phone. He's talked me through countless trouble with friends and supported me during heartbreaks and grief. My Dad was on the phone with my Mom while I received my first holy communion in the 2nd grade and when I received confirmation in the 7th grade. He "attended" my dance recitals, concerts when I played bass guitar in high school, and my soccer games growing up (which really means he was listening on the phone with my mom and waiting on the line when to check in with me). He "attended" my Kindergarten, 5th grade, 8th grade, High School, Undergraduate, and Graduate graduation ceremonies …
>
> My Dad has also always taught me that I need to choose my friends very wisely, a lesson I assumed he learned the hard way from his own choices in life. He has always guided me to follow the harder, longer path in life, as my Dad calls it. He has guided me through very difficult times in my life like living through the trauma of 9/11 in NYC, my struggles with my mental health, and when I balanced working three jobs to put myself through college and graduate school. I am lucky to have two parents who have wonderful senses of humor, and have so many memories of my Dad turning my tears into laughter over the phone.

*See* Exhibit "E" (Brigitte Giattino Letter, dated October 28, 2020, Dkt. No. 721-3); Exhibit "G" (Photos of Brigitte Giattino and Vincent Giattino).

As her "biggest supporter and champion," Mr. Giattino also encouraged and inspired Brigitte to pursue her education goals and seek become the "first Dr. Giattino in [their] family." She writes,

> Over the countless phone calls for the last 30 years, my Dad instilled in me that school was my way to success. My Dad encouraged me dive into the world of books as a healthy way of coping, as it is also his method of escaping from his world for a short period. I am the first member of my family to graduate high school. He encouraged me (and still does) to go as far in school and my career as I possibly can. I am a proud alumni of the City University of New York-Brooklyn College, where I've earned a Bachelors of Science with a major in Pre-Medicine and Psychology, a Masters of Science in Education, and a Post-Masters certification in School Psychology. I want nothing more than to give my Dad a hug in my cap and gown, because he is my biggest supporter and champion. My Dad wants to me to pursue a doctoral degree, so that I can be the first Dr. Giattino in our family. I know that my studies and success make him very proud …
>
> The most important lesson that my father has taught and modeled for me is empathy. Now that I am working as a Psychologist for a public school district and find myself serving at-risk children and families, I talk a lot about my work life with my Dad during our phone calls … My father is extremely proud to have a raised a daughter that is not complacent to injustices, as he taught me to stand up for what is right. He taught me to question everything and everyone, and always reminded me that I could always rely on my family. He instilled in me to use my voice for myself and for others, and that if I didn't feel heard I had to keep trying until I found someone who'd listen. I grew into the resilient, assertive woman I am today because of this guidance from both my mother and father, along with their push for my education to go as far as I was willing to take it.

See Exhibit "E" (Brigitte Giattino Letter, dated October 28, 2020, Dkt. No. 721-3).

Brigitte is keenly aware of her father's mortality, especially because of his age and serious health issues. She struggles with the impact of losing her father and experiencing the "first and only time … with him outside of prison … at his funeral." She desires nothing more than to have "time with [her father] in real life, no matter how little that may be." She writes,

> Knowing that my Dad may pass away in prison is not something I have fully processed. I'm not sure if anyone possibly could. Sometimes, I catch myself fantasizing about playing at a playground with my Dad and my future children. I do not want to bring my children into a prison facility for visits with my Dad, for I fear that what happened with my mental health may happen to theirs. It pains me beyond words to know that the first and only time I may have with him outside of prison may be at his funeral. I want nothing more in life than to go out to dinner with my Dad, as cooking and eating are one of our many

13

> shared interests … [Because of the pandemic], [m]y Dad is being locked in isolation for weeks at a time, and he has to choose between making a phone call to me, taking a shower, or going outside for some fresh air. He always chooses to call me because he'd rather have peace of mind from hearing my voice and knowing that I am doing okay. Given his age and current health conditions, I am begging you from the bottom of my heart, to please give us your compassion. I know, as his daughter and as a mental health professional, that my father is not a danger to society. He has a loving family that will take care of him and live out his senior years alongside him. I wish that I had the power to have time with him in real life, no matter how little time that may be. I hope that you can find it in your heart and use your power as a judge to help mend our family back together for his remaining years.

See Exhibit "E" (Brigitte Giattino Letter, dated October 28, 2020, Dkt. No. 721-3).

### vi. Purposes of Sentencing

Mr. Giattino was convicted of serious offenses in his 30s. However, where an inmate is nearing 70 years of age after serving three decades in prison, unquestionably a "significant sanction," *United States v. McGraw*, 02 Cr. 18 (LJM)(CMM), 2019 WL 2059488, at *5 (S.D. Ind. May 9, 2019),[25] and engages in significant rehabilitation efforts, and now incarcerated under harsh and brutal conditions, continued incarceration undermines "respect for the law." Additionally, further incarceration of Mr. Giattino, who determined to help raise his daughter, sought to improve himself and the lives of those around him in prison, without any possibility of release, also undermines "respect for the law." Here, fairness and justice, along with § 3553(a) and the purposes of sentencing, call for Mr. Giattino's release.

Reducing Mr. Giattino's sentence to time served, while placing him on supervised release and home confinement, will provide "just punishment" and deter any chance of future criminal conduct.[26] Mr. Giattino's offenses occurred three decades ago while in his 30s and living in a very different New York. He is now almost 70 years old and in poor health. Moreover, Mr. Giattino is not a danger. Rather, as indicated in the letters from his family, prison staff and other inmates, he can rejoin his family and continue to make positive contributions to others and his community. Further, reduction of his life sentence to time served will not diminish the seriousness of the offenses. As the court found in *United States v. Best*, 93 Cr. 216 (MU), 2006

---

[25] Mr. McGraw, who was released, had been in custody for 17 years for his participation in a narcotics conspiracy. He was found guilty after trial and sentenced to life imprisonment in 2003.

[26] Mr. Giattino is not a danger to the community and therefore does not need to be incarcerated to protect the public. He has "aged out" of criminal activity. As a matter of statistical probability, individuals of Mr. Giattino's age, 68, are unlikely to reoffend on release from prison. Kim Steven Hunt & Robert Dumville, U.S. Sentencing Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview* 5 (2016), at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf.

WL 2176980, at *4 (W.D.N.C. July 31, 2006), life terms "are not always in the best interests of society" and "should be reserved for the worst offenders, whose offenses of conviction involved serious or extreme acts of violence" – that is, individuals other than Mr. Giattino.

In sum, Mr. Giattino's life sentence only keeps him at grave risk of "death by incarceration" and no longer serves any sentencing purpose; it has now become "immeasurably greater than necessary." Further, with no defendant receiving more than 20 years (aside from Pitera), even those convicted of murders like Richard David and William "Billy" Bright, a reduction in Mr. Giattino's sentence will still result in him receiving the second longest sentence imposed in the case. As such, releasing Mr. Giattino now will not create any sentencing disparities. Rather, it will correct existing ones.

  4. **Other Defendants Sentenced to Life Imprisonment Following Convictions for Murder and Related Offenses After Trial Have Been Granted "Compassionate Release" or Received Sentencing Reductions**

In the Court's decision denying Mr. Giattino's initial motion for "compassionate release," it determined that the "nature and seriousness of Defendant's crimes mandate his continued detention." Dkt. No. 723, p. 5. Though his crimes of conviction involved serious violence, other courts have found that such does automatically bar relief. Over the last few years, courts have taken "second looks" and granted "compassionate release" *or* reduced sentences for defendants who were sentenced to life imprisonment following convictions after trial, including convictions involving murders, and murders and other related offenses committed as part of their leadership and or participation in "organized crime." Such "compassionate release" grants, which were based largely on a defendant's post-sentencing rehabilitation, age, length of incarceration and existence of serious health conditions, continued following this Court's denial of Mr. Giattino's initial motion for "compassionate release." These include the following:

- On July 23, 2020, the Honorable Lewis J. Liman granted the "compassionate release" of Rita Gluzman, who had premeditated the murder of her estranged husband, killing him with a co-defendant with axes and dismembering his body with a hacksaw. She later attempted to flee the country and was convicted after trial and sentenced to life imprisonment. Ms. Gluzman, who had served 24 years in prison, was released because her medical conditions and risk of severe illness or death related to COVID-19, and her rehabilitation efforts. *See United States v. Gluzman*, 96 Cr. 323 (LJL) (S.D.N.Y. July 23, 2020).

- On September 30, 2020, the Honorable Jed S. Rakoff reduced Diego Rodriguez's life sentence related to his convictions after a capital trial, which included the murder of a government informant, to 30 years, based on his rehabilitation and risk of severe illness or death related to COVID-19. Mr. Rodriguez was convicted in September 2004, following a seven-week jury trial, on substantive and conspiratorial counts related to racketeering, drug trafficking and the murder of a confidential informant in connection with drug trafficking. In the 1990s, Rodriguez, along with his co-defendant at trial, Alan Quinones, ran a racketeering enterprise. Quinones was the head. Rodriguez was the chief lieutenant of the enterprise, which sold wholesale

15

quantities of narcotics. On June 27, 1999, Mr. Rodriguez kidnapped Eddie Santiago, a government informant, and brought him to a residence. Inside the residence, Mr. Rodriguez and at least one other individual, beat, handcuffed and hogtied Mr. Santiago. Mr. Rodriguez and Quinones held Mr. Santiago for hours and taunted and spat in his face. They then killed Mr. Santiago, removed his body from the residence, and burned it. The next day, Santiago's charred dead body was found in a vacant lot in the Bronx. *See United States v. Quinones,* 511 F.3d 289, 292 (2d Cir. 2007). Mr. Rodriguez had served 20 years. *See United States v. Rodriguez*, 00 Cr. 761 (JSR) (S.D.N.Y. September 30, 2020).

- On December 8, 2020, the Honorable Janet Bond Arterton granted "compassionate release" for Hector Luis Rios and reduced his life sentence to 30 years, despite finding that he acted "with the heart of a calculated killer." He had served 26 years. In 1995, Mr. Rios, a member of the Latin Kings gang, was convicted by a jury of murder, drug-trafficking and racketeering. In 1996, with six prior felony convictions, he was sentenced to three terms of life imprisonment. Mr. Rios' life sentence was reduced to 30 years based on his rehabilitation and vulnerability to COVID-19 related to his medical conditions, which included obesity, hypertension, asthma, a lung condition and arthritis. *See United States v. Hector Luis Rios*, 94 Cr. 112 (JBA) (D. Conn., December 8, 2020).

- On January 15, 2021, the Honorable Sidney H. Stein granted "compassionate release" for William Underwood, who organized and was the leader of "the Vigilantes," a street-level heroin-distribution operation based in West Harlem in the 1970s. He did so for nearly 20 years. In 1988, Mr. Underwood was arrested and in 1990 was convicted after a jury trial of participating in a racketeering enterprise, RICO conspiracy, narcotics conspiracy and participating in a continuing criminal enterprise. Due to his role in at least 5 murders "aimed specifically at eliminating and intimidating competitors, informants, and actual or potential witnesses," Mr. Underwood was sentenced to life imprisonment. Mr. Underwood was released after serving 34 years based on his rehabilitation and health risks associated with the COVID-19 pandemic. *See United States v. William Underwood*, 88 Cr. 822 (SHS) (S.D.N.Y., January 15, 2021).

- On January 22, 2021, despite reference to his offenses as "horrific," the Honorable Arthur Tarnow granted "compassionate release" for John Bass after he was sentenced to two life sentences following a capital trial in 2003, in which he was convicted of participating in a drug-related murder and drug-trafficking. He was 34 years old. From 1989 to 1997, Mr. Bass formed and lead a drug-trafficking organization known as the "Dog Pound." Mr. Bass and the organization distributed in excess of fifty kilograms of crack cocaine and five kilograms of cocaine in Michigan and Ohio. Based on his rehabilitation and health risks posed to him because of his medical conditions, he was released after serving 22 years. *See United States v. John Bass*, 97 Cr. 80235 (AJT) (E.D. Mich., January 22, 2021).

- On March 4, 2021, the Honorable Janet Bond Arterton, granted "compassionate release" for Wilfredo Perez after he was sentenced to life imprisonment following a capital trial in 2004. Mr. Perez was convicted of procuring the murder of Theodore Casiano to protect his drug distribution operation. From 1992 to 1996, Mr. Perez was the leader of a large-scale drug distribution ring in Hartford, Connecticut. To resolve his conflict with Casiano, Mr. Perez hired two men to kill him for $6,000. After 23 years' imprisonment, Mr. Perez was released based on his rehabilitation and health risks associated with COVID-19. *See United States v. Wilfredo Perez*, 02 Cr. 7 (JBA) (D. Conn., March 4, 2021).

- On June 17, 2021, the Honorable Gary A. Fenner granted "compassionate release" for Eddie David Cox, a leader of the "Black Mafia," a drug-trafficking organization in Kansas City in the l970s and 1980s. The organization was responsible for at least 17 murders and several bank robberies. Cox was accused of participating in the killing of a federal agent in Chicago. Following a jury trial, Mr. Cox was convicted on all 12 counts. At sentencing, it was determined that he had numerous felony convictions from 1954 to 1984. For instance, he was incarcerated for ten years after shooting a police officer and fifteen years for his participation in a drug conspiracy. Found to be an "Armed Career Criminal" pursuant to 18 U.S.C. § 924(e)(1), Mr. Cox was sentenced to life imprisonment. At 86 years of age, he was released after serving 32 years' imprisonment. *See United States v. Eddie David Cox*, 89 Cr. 196 (GAF) (W.D.M.O. June 17, 2021).

The above "compassionate release" grants and sentencing reductions are in accordance with statistics from the United States Sentencing Commission (The "Sentencing Commission"). The Sentencing Commission reports that the median sentence imposed in federal court for murder in 2020 was 228 months' imprisonment nationally.[27] Additionally, in the Eastern District of New York, the mean and median sentences imposed for murder were 182 months' imprisonment and 121 months' imprisonment respectively.

Courts have also reduced sentences and or granted "compassionate release" for defendants who led criminal organizations (which were involved in violence) and were convicted of serious drug-trafficking offenses following trial and sentenced to life imprisonment:

- *United States v. Panton*, 89 Cr. 346 (LAP): On August 4, 2020, the Honorable Loretta A. Preska granted Robert Panton was granted "compassionate release." Mr. Panton, who had been incarcerated for nearly 30 years, was granted release based on his medical conditions, along with his rehabilitation efforts and family support. He had been convicted after trial of participating in a large-scale heroin distribution conspiracy, which involved firearms, and sentenced to life imprisonment. *See United States v. Panton*, 89 Cr. 346 (LAP) (S.D.N.Y. August 4, 2020).

---

[27] *See* USSC Statistical Information Packet, Fiscal Year 2020, available at https://www.ussc.gov/research/data-reports/federal-sentencing-statistics-district-circuit-state

- *United States v. Millan*, 91 Cr. 685 (LAP): On April 6, 2020, the Honorable Loretta A. Preska granted the "compassionate release" of Eric Millan after he had served more than 28 years. Mr. Millan, who was the leader of a major heroin distribution organization known as Blue Thunder, which distributed more than $100 million worth of heroin in Manhattan and the Bronx from 1986 until 1991, was released based on his "extraordinary rehabilitation." *See United States v. Millan*, 91 Cr. 685 (LAP) (S.D.N.Y. April 6, 2020).

- *United States v. Fisher*, 83 Cr. 150 (PAC): On October 9, 2020, the Honorable Paul A. Crotty granted "compassionate release" for Guy Fisher after he had served 38 years of a life sentence, which was imposed in 1984 for his participation in a narcotics conspiracy. Fisher was a member of the "Council," a group of seven individuals who ran an extensive narcotics enterprise operated in New York City from 1972 to 1983. Leroy "Nicky" Barnes was a founding member of the "Council." As part of its operations the "Council" also approved the "murders of those suspected of being potential witnesses against the Council or of people who had been insubordinate." Based on his rehabilitation and the ongoing COVID-19 pandemic, Mr. Fisher, despite "[stealing] away the lives of others," was released at age 73. *See United States v. Fisher*, 83 Cr. 150 (PAC) (S.D.N.Y. October 9, 2020).

- *United States v. Monsanto*, 87 Cr. 555 (LAP): On February 2, 2021, the Honorable Loretta A. Preska granted "compassionate release" for Peter Monsanto after he had served over 34 years of a life sentence after his conviction at trial of RICO violations, RICO conspiracy, narcotics conspiracy, operating a continuing criminal enterprise ("CCE"), six counts of possession of firearms and four counts of federal income tax evasion. He was 71 years old. Mr. Monsanto was the leader of a heroin distribution network, known as the "Monsanto Crew," that existed from 1981 to 1986 and distributed massive amounts of heroin in New York City and the northeastern United States. The "Monsanto Crew" was extremely violent. It used violence to secure and maintain its position in the heroin business and to enforce discipline within the organization. Mr. Monsanto had a criminal history, including a conviction for manslaughter. He was released based on his rehabilitation and danger posed to him by COVID-19. *See United States v. Monsanto*, 87 Cr. 555 (LAP) (S.D.N.Y. February 2, 2021).

- *United States v. Piggott*, 94 Cr. 417 (SHS): On January 11, 2022, the Honorable Sidney H. Stein granted "compassionate release" for James R. Piggott, who was a leader of a nationwide drug-trafficking and money laundering conspiracy. Mr. Piggott, following his 1995 trial, was convicted on twenty separate counts relating to his leadership in a narcotics conspiracy, money laundering and participating in a continuing criminal enterprise. Prior to his trial, he had been convicted three times for robbery. Mr. Pigott, 67, was released after serving 26 years in prison based on his age, serious medical conditions and rehabilitation. *See United States v. Piggott*, 94 Cr. 417 (SHS) (S.D.N.Y. January 11, 2022).

As described, various courts have determined that despite the serious nature of defendants' crimes, including murders, and murders committed in connection with "organized crime," "compassionate release" *or* a sentencing reduction was consistent with the factors delineated in § 3553(a). Mr. Giattino is no different. Having been convicted of "taking part" in two homicides (and was not the principal) and participating in other offenses nearly 30 years ago, he has engaged in significant rehabilitation efforts. Further, now almost 70 years old, he suffers from several serious medical conditions.

### 5. Conclusion

Vincent Giattino is now experiencing his 4th decade of incarceration and has been sufficiently punished for his offenses of conviction. Based on the "totality of circumstances," "extraordinary and compelling reasons" exist for a reduction in Mr. Giattino's sentence and release. Because of the "trial penalty" he paid, massive disparities exist between his plea offer and post-trial sentence, and sentences of similarly-situated co-defendants, all of whom are released or passed away. Further, while his offenses of conviction are undeniably serious, defendants who had received sentences of life imprisonment after trial for murders, and murders and other related offenses committed as part of their leadership and or participation in "organized crime" have been granted "compassionate release" *or* reductions in their sentence. Such reflects a shift by federal courts to engage in a "second look" of life sentences, where elderly defendants have been incarcerated for decades, suffer from serious medical conditions and engaged in significant rehabilitation efforts. Finally, he remains at risk of serious illness or death should he be infected with COVID-19 and has been incarcerated under brutal and harsh conditions for approximately the last 2 years.

An examination of the § 3553(a) factors further supports release *or* a reduction in his sentence. Now much older, he is not the same man who was arrested in 1991. Despite a life sentence, Mr. Giattino engaged in ongoing and significant rehabilitation efforts. Further, he did his best to be a father and raise Brigitte. He maintained relationships with his family. In so doing, Mr. Giattino transformed. He is not a danger and a release plan is in place, involving a stable residence, suitable employment and family support. He is also in poor health, which puts him at "high risk" of serious illness or death if infected with COVID-19, or, simply, dying in prison. Further incarceration for Mr. Giattino, under the present dire circumstances, amounts to excessive and cruel punishment, creates sentencing disparities, and does not serve any proper sentencing purpose. Additionally, release to home confinement and placement on supervised release, is now appropriate. Again, it is also just. And it is merciful and consistent with redemptionz. Accordingly, we implore the Court to exercise its power and authority and grant Vincent Giattino's application for "compassionate release." In the alternative, we ask that the Court reduce his sentence.

In the alternative, we respectfully request a hearing and that Mr. Giattino be present in-person or by video.

Respectfully submitted,

/s/

Anthony Cecutti
*Attorney for Vincent Giattino*